UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

KATHRYN GRACE JORDAN,

                                 Plaintiff,

                 -v-

CHASE MANHATTAN BANK, et al.,

                             Defendants.

------------------------------------------------------------------X

13 Civ. 9015 (PAE)

<u>OPINION & ORDER</u>

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/6/2015

PAUL A. ENGELMAYER, District Judge:

      Plaintiff Kathryn Grace Jordan, proceeding *pro se*, brings this action against defendants

Chase Manhattan Bank, Chase Bank USA National Association, JPMorgan Chase & Co.,

JPMorgan Acquisition Trust 2007, and Chase Home Finance (collectively, "Chase" or "JPMC");

Deutsche Bank AG and Deutsche Bank National Trust Company (collectively, "Deutsche

Bank"); and Shutts & Bowen, a law firm in Miami, Florida (collectively, "defendants").  Jordan

asserts numerous federal and state law claims arising out of the 2008 refinancing of her mortgage

on a property in Palm Beach, Florida, the 2009 foreclosure of that property, and a 2012

garnishment action brought against Jordan in Florida state court.  The crux of Jordan's federal-

law claims is that defendants discriminated against her in various ways because she is disabled

and receives disability benefits.

      In 2014, defendants moved to dismiss Jordan's earlier First Amended Complaint

("FAC"), pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), for lack of subject

matter jurisdiction and failure to state a claim upon which relief can be granted.  In a decision

issued on July 31, 2014, the Court granted that motion, but gave Jordan leave to amend.  Jordan

thereafter filed an amended pleading.  Now pending before the Court is defendants' motion to dismiss Jordan's amended pleading for failure to state a claim.  For the following reasons, that motion is granted.

## I.    Background

### A.    Factual Background[1]

In 2006, Jordan entered into an agreement to buy a condominium in Palm Beach, Florida (the "Palm Beach property").  Pl. Aff. 5.  To finance that purchase, Jordan obtained a mortgage from Chase.  *See* Dkt. 79 ("Pl. Br."), at 10–11.  In 2008, Jordan fell behind on her mortgage payments.  *See id.*  She therefore sought to refinance the mortgage.  Pl. Aff. 4.  Jordan alleges that Chase verbally promised to maintain the same loan duration in the refinanced mortgage as in the original, at a loan rate competitive with those of other banks in the area.  FAC at 3.  Before the transaction was completed, however, Jordan noticed that the "Title Agent had swapped out the loan for a shorter term [adjustable-rate mortgage]."  *Id.* at 3–4.  Jordan informed Chase of that discrepancy, but Chase did not modify the loan documents.  *Id.* at 4–5.  Jordan also claims that Chase "expressed concerns and biases" and "initially refus[ed] the application" as a result of "irrational fears about the reliability of [Jordan's] income as a disabled person."  *Id.* at 15.

In 2009, Chase and Deutsche Bank, in "collusion" with the condominium association, foreclosed Jordan's Palm Beach property.  Pl. Aff. 4.  During the foreclosure process, Chase was obliged to disclose "all options available to [Jordan] particularly given her Disability status," but

---

[1] This account of the facts is drawn from Jordan's FAC, Dkt. 21, and her affidavit in support of her Second Amended Complaint, Dkt. 67 ("Pl. Aff.").  The Court construed these documents, together, as Jordan's Second Amended Complaint ("SAC").  *See* Dkt. 69.  For the purpose of resolving the motion to dismiss, the Court assumes all well-pled facts to be true, drawing all reasonable inferences in favor of the plaintiff.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

Chase "never disclosed any HAMP [Home Affordable Modification Program] programs." FAC at 16. Jordan alleges that Chase "failed to do so due to their discriminatory animus toward her as a Disabled person." *Id.* For Jordan, the foreclosure led to years of housing and financial instability. Pl. Aff. 4–5. Chase also delayed reporting the foreclosure to credit agencies, "knowing it would extend her credit deficits for several years." *Id.* at 5.

At some point, Jordan sued James Pappas, the person who sold her the Palm Beach property, in Florida state court. *Id.* at 3–10. Jordan accused Pappas of HUD violations and fraud based on, *inter alia*, repeated delays in the closing date and concealed defects in the unit. Pl. Br. 4. Jordan's case against Pappas was dismissed, Pl. Aff. at 3–4, and the Florida court awarded legal fees to Pappas's counsel, *id.* at 11. In 2012, Pappas's attorneys commenced a garnishment action against Jordan, also in Florida state court. *Id.* at 4. In the course of the garnishment proceedings, the Florida court "made increasingly abusive invasions into [Jordan's] financial privacy," and an attorney from Shutts & Bowen, which represented Chase, engaged in "collusive threats and schemes . . . to try to gain illicit access to [Jordan's] Chase assets." FAC at 9.

As a result of the garnishment proceedings, Jordan alleges, a $75,000 lien was filed on her Chase account, and Chase froze Jordan's assets, including disability benefit payments that, Jordan claims, are exempt from garnishment. Pl. Aff. at 7–8. Jordan was therefore unable to "buy food, medication, pay for housing, and travel to her physicians." FAC at 8. Also in 2012, Chase closed Jordan's overdraft line of credit without notice, causing further financial instability. Pl. Aff. 5, 35. According to Jordan, "[i]t is apparent from the long patter[n] of facts, that Chase was excessively anxious about [Jordan] as a Disabled person," FAC at 17, and that its conduct "clearly was related to Chase's long biases against [Jordan] as a disabled person," *id.* at 19.

### B.    Procedural History

On December 19, 2013, Jordan filed her initial complaint. Dkt. 1. On January 9, 2014, defendants moved to dismiss for lack of jurisdiction. Dkt. 5–7. On March 26, 2014, after several extensions, Jordan filed her Amended Complaint. Dkt. 21 ("FAC"). It consisted of six "counts," which the Court construed to assert claims under: (1) § 407 of the Social Security Act ("SSA"), 42 U.S.C. § 407; (2) the Emergency Economic Stabilization Act of 2008 ("EESA"), 12 U.S.C. § 5201 *et seq.*, specifically, the Home Affordable Modification Program ("HAMP"), *id.* § 5219a; the Consumer Credit Protection Act ("CCPA"), specifically, (3) the restrictions on garnishment contained in 15 U.S.C. § 1673, and (4) the equal credit opportunity provisions in 15 U.S.C. § 1691; (5) the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*; and (6) New York and Florida law.

On April 17, 2014, defendants renewed their motion to dismiss the Amended Complaint. Dkt. 29–30. On July 31, 2014, after briefing, the Court granted defendants' motion. Dkt. 49 ("July 31 Opinion"), *reported at Jordan v. Chase Manhattan Bank*, No. 13 Civ. 9015 (PAE), 2014 WL 3767010 (S.D.N.Y. July 31, 2014). The Court held that Jordan's first three claims were not viable because § 407 of the SSA, the HAMP provisions in the EESA, and § 1673 of the CCPA do not create private rights of action. *Id.* at 10–13. The Court also held that some of Jordan's claims under § 1691 of the CCPA were barred by the statute of limitations, and that Jordan's allegations of discrimination were too conclusory to sustain the timely claims. *Id.* at 17–19. Similarly, the Court held that some of Jordan's FHA claims were time-barred, and the timely claims did not pertain to residential real-estate transactions, as required for the statute to apply. *Id.* at 13–17. As to Jordan's state-law claims, the Court held that it lacked diversity jurisdiction because both Jordan and defendant Chase reside in New York. *Id.* at 8–9. The Court

4

declined to exercise supplemental jurisdiction over Jordan's state-law claims and dismissed her complaint. *Id.* at 20–21. This dismissal was without prejudice: The Court authorized Jordan to file a Second Amended Complaint ("SAC"), "this time stating a legally adequate basis for federal jurisdiction." *Id.* at 21.

The original deadline for Jordan's SAC was September 29, 2014. *See id.* at 21; *see also* Dkt. 51, 55. On September 30, 2014, the Court extended the deadline until October 13, 2014. Dkt. 63. On October 7, 2014, the Court extended the deadline until October 31, 2014 but noted that, "[a]bsent extraordinary circumstances," it would not grant a further extension of time. Dkt. 66. On November 1, 2014, Jordan filed a 41-page "affidavit in support of second amended complaint," which is listed on the docket as an amended complaint. Dkt. 67 ("Pl. Aff."). There, Jordan added factual allegations and requested another extension to file a formal amended pleading. *Id.* The Court denied Jordan's request for a third extension of time and instead construed the affidavit, along with Jordan's FAC, as her SAC. Dkt. 69.

On November 21, 2014, defendants filed a motion to dismiss the SAC, Dkt. 76, along with a memorandum of law, Dkt. 77 ("Def. Br."), and a declaration, Dkt. 78 ("Def. Decl.").[2] On December 10, 2014, Jordan submitted her opposition, styled as a motion to dismiss defendants' motion to dismiss. Dkt. 79 ("Pl. Br."). On January 2, 2015, defendants filed their reply. Dkt. 80 ("Def. Reply"). On February 26, 2015, Jordan filed a letter responding to defendants' reply. Dkt. 84.

---

[2] Jordan asks the Court not to dismiss her claims *sua sponte*. *See* Pl. Br. 6, 25. In certain instances, the Court may indeed dismiss a complaint "on its own," "without prompting" from either party. *See* Black's Law Dictionary (10th ed. 2014) (defining "*sua sponte*"). Here, however, in deciding whether to dismiss the SAC, the Court does not act *sua sponte*, but in response to defendants' motion to dismiss.

## II.    Applicable Legal Standards[3]

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Accordingly, a district court must accept as true all well-pled factual allegations in the complaint, and draw all inferences in the plaintiff's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).[4] However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

District courts are "obligated to construe *pro se* complaint[s] liberally," *Harris*, 572 F.3d at 72, interpreting them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006). Courts may not, however, read into *pro se* submissions claims inconsistent with the *pro se* litigant's allegations, *Phillips v. Girdich*, 408

---

[3] Federal courts must apply federal procedural law. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996). Accordingly, the Court did not consider or apply the New York state procedural law cited in Jordan's brief. *See* Pl. Br. 7–9.

[4] At the motion to dismiss stage, the Court may consider *only* plaintiff's complaint, documents attached thereto or incorporated by reference, and certain publicly available information. *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–55 (2d Cir. 2002). The Court may not consider any factual allegations or substantive evidence submitted by defendants. Accordingly, defendants' decision not to submit their own allegations or evidence was appropriate and is not, as Jordan suggests, a failing on their part. *See* Pl. Br. 7–8, 36.

F.3d 124, 127 (2d Cir. 2005) (citation omitted), or arguments that the submissions themselves do not "suggest," *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006). *Pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law." *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983) (citation omitted).

Jordan asks the Court to take two other steps in light of her status as a *pro se* and disabled plaintiff. First, Jordan asks the Court to apply a "gentle approach," Pl. Br. 6, 35–36, that was used by the Seventh Circuit in *Swanson v. Citibank, N.A.*, 614 F.3d 400 (7th Cir. 2010). There, the Seventh Circuit held that, to survive a motion to dismiss, "the plaintiff must give enough details about the subject-matter of the case to present a story that holds together. In other words, the court will ask itself could these things have happened, not did they happen." *Id.* at 404. Sitting in the Second Circuit, this Court is bound to apply Second Circuit (and Supreme Court) law and cannot rely on out-of-circuit authority inconsistent with the precedents of those courts. It is unclear to the Court whether the "could . . . have happened" standard for evaluating a *pro se* complaint articulated in *Swanson* is in accord with the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). *See Swanson*, 614 F.3d at 407 (Posner, J., dissenting in part). However, the Court has reviewed Jordan's SAC mindful of the duty to review *pro se* complaints liberally. And the outcome the Court reaches here would be the same even under the Seventh Circuit's *Swanson* standard.

Second, Jordan asks the Court to consider new factual allegations contained in her opposition to the motion to dismiss. *See* Pl. Br. 1, 24. "[I]t is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss." *Weir v. City of New York*, No. 05 Civ. 9268 (DFE), 2008 WL 3363129, at *9 (S.D.N.Y. Aug. 11, 2008) (citation omitted). However, as discussed below, *see infra* pp. 24–25, the Court has considered these allegations in

determining whether to grant Jordan leave to file a Third Amended Complaint. Had these new

allegations, considered in conjunction with her existing allegations, stated a claim, the Court

would have granted leave to amend. Because Jordan's allegations (old and new) do not do so,

the Court has dismissed her federal claims with prejudice.

**III.    Federal Law Claims**

As noted, the FAC asserted claims under § 407 of the SSA, the HAMP provisions in the

EESA, § 1673 and § 1691 of the CCPA, and the FHA. Jordan's SAC and her opposition to

defendants' now-pending motion to dismiss supplement her prior filings in two ways: First,

Jordan makes new legal arguments to support the claims asserted in the FAC. Second, Jordan

provides additional factual allegations to strengthen those claims and assert new ones. Most of

the new allegations pertain to Chase's delay in reporting Jordan's default to credit agencies,

defendants' discriminatory animus, and the preceding litigation in Florida state court. The Court

addresses each of Jordan's claims in turn.

**A.    The SSA, CCPA § 1673, and HAMP Claims**

The Court interpreted the FAC to assert claims under a section of the SSA that exempts

Social Security payments from garnishment, 42 U.S.C. § 407; a section of the CCPA that

similarly restricts garnishment, 15 U.S.C. § 1673; and the HAMP provisions in the EESA, 12

U.S.C. § 5219a *et seq.*, which impose disclosure requirements on mortgage servicers. In the July

31 Opinion, the Court dismissed those claims because those provisions do not create private

rights of action. Dkt. 49, at 10–13. Jordan now challenges the Court's reasoning and attempts to

revive those claims. *See* Pl. Br. 25, 31. For Jordan's benefit, the Court briefly clarifies the law

underlying its previous decision.

A private right of action is "an individual's right to sue in a personal capacity to enforce a legal claim." Black's Law Dictionary (10th ed. 2014) (defining "private right of action"). Not every federal statute provides a private right of action. *See, e.g., Astra USA, Inc. v. Santa Clara County*, 131 S. Ct. 1342, 1345 (2011) (no private right of action under a Public Health Services Act provision imposing ceiling prices for certain sales of medications); *Alexander v. Sandoval*, 532 U.S. 275, 293 (2001) (no private right of action to enforce disparate-impact regulations promulgated under Title VI of the Civil Rights Act of 1964); *Republic of Iraq v. ABB AG*, 768 F.3d 145, 171 (2d Cir. 2014) (no private right of action under the anti-bribery provisions of the Foreign Corrupt Practices Act); *Lopez v. Jet Blue Airways*, 662 F.3d 593, 597 (2d Cir. 2011) (no private right of action under the Air Carrier Access Act). Such statutes are enforced through means other than lawsuits brought by aggrieved individuals. The Air Carrier Access Act, for example, is enforced by the Department of Transportation through administrative procedures. *Lopez*, 662 F.3d at 597.

As the Court has explained, where a statute does not explicitly provide for a private right of action, "we begin with the presumption that Congress did not intend one." *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 116 (2d Cir. 2007). The Supreme Court has set out "a four-factor test to determine whether a federal statute creates an implied right of action: (1) whether the statute was enacted to benefit a special class; (2) whether the drafters intended to create a private right of action; (3) whether a private right of action would be consistent with the purposes of the statute; and (4) whether the cause of action is one not traditionally relegated to the states." *Conboy v. AT&T Corp.*, 241 F.3d 242, 252 (2d Cir. 2001) (citing *Cort v. Ash*, 422 U.S. 66, 78 (1975)). The critical issue under this test is the second prong—whether Congress intended to create a private right of action—and "[t]he person seeking a private remedy bears the burden of

demonstrating that Congress intended to make one available." *N.Y. City Envtl. Justice Alliance v. Giuliani*, 214 F.3d 65, 73 (2d Cir. 2000) (citation omitted).

Neither § 407 of the SSA, nor § 1673 of the CCPA, nor the HAMP provisions in the EESA expressly creates a private right of action. *See* 42 U.S.C. § 407; 15 U.S.C. § 1673; 12 U.S.C. § 5219a. Accordingly, for this Court to hold that any of these provisions implicitly creates a private right of action, Jordan must demonstrate that Congress intended to make a private right of action available, so as to overcome the presumption against implied rights of action. *See Bellikoff*, 481 F.3d at 116; *N.Y. City Envtl. Justice Alliance*, 214 F.3d at 73. Jordan argues that, without a private right of action, these statutes would create a right without a remedy. *See* Pl. Br. 31. But, in fact, these statutes are effected through other means: § 407 serves as a defense to garnishment actions, *Townsel v. DISH Network L.L.C.*, 668 F.3d 967, 969 (7th Cir. 2012); § 1673 is enforced by the Secretary of Labor, *Long Island Trust Co. v. U.S. Postal Serv.*, 647 F.2d 336, 341 (2d Cir. 1981); and HAMP is administered by the Secretary of the Treasury, *Nelson v. Bank of Am., N.A.*, 446 F. App'x 158, 159 (11th Cir. 2011) (per curiam). Thus, Jordan has provided no basis for the Court to infer that Congress intended to create a private right of action to enforce any of these provisions.

Moreover, Jordan has not identified, and the Court has not found, authority supporting the existence of such a right. To the contrary, the courts that have considered the issue have consistently concluded that these provisions do not create private rights of action. *See, e.g.*, *Townsel*, 668 F.3d at 970 (collecting cases finding no private right of action under § 407); *Pressman v. Neubardt*, No. 02 Civ. 8404 (RCC), 2002 WL 31780183, at *2 (S.D.N.Y. Dec. 12, 2002) (collecting cases finding no private right of action under § 1673); *Wheeler v. Citigroup*, 938 F. Supp. 2d 466, 471 (S.D.N.Y. 2013) (collecting cases finding no private right of action

under HAMP).  Therefore, to the extent the SAC can be read to allege a violation of § 407 of the

SSA, § 1673 of the CCPA, or HAMP, it fails to state a claim.

### B.      FHA Claims

The FHA, as relevant here, prohibits discrimination against handicapped persons in the

availability and terms and conditions of residential real-estate transactions.  *See* 42 U.S.C.

§ 3605.  In the July 31 Opinion, the Court dismissed some of Jordan's FHA claims as time-

barred and others as unrelated to residential real-estate transactions.  Jordan's opposition to

defendants' motion to dismiss presents new theories as to why her original claims are timely, and

why they are covered by the FHA; she also makes a new claim as to Chase's delayed reporting

of Jordan's default on her mortgage.  The Court addresses each of these three issues in turn.

#### 1.      Statute of Limitations

Under the FHA, "a person 'may commence a civil action in an appropriate United States

district court or State court not later than 2 years after the occurrence or the termination of an

alleged discriminatory housing practice . . . to obtain appropriate relief with respect to such

discriminatory housing practice or breach.'"  *Adams v. Han*, 478 F. App'x 686, 687 (2d Cir.

2012) (summary order) (quoting 42 U.S.C. § 3613(a)(1)(A)).  Because Jordan commenced this

action on December 19, 2013, her FHA claims are time-barred insofar as they involve events that

occurred before December 19, 2011.  As alleged, Jordan refinanced her mortgage in 2008, and

the foreclosure occurred in 2009.  *See* FAC 16–17; Pl. Aff. 4.  Jordan's FHA claims are therefore

untimely to the extent they are based on the refinancing and the foreclosure.

Jordan argues, as previously, that the Court should equitably toll the statute of limitations.

Pl. Aff. 35–36.  As the Court explained in the July 31, 2014 Opinion, however, equitable tolling

is "an extraordinary measure that applies only when [a] plaintiff is prevented from filing despite

exercising that level of diligence which could reasonably be expected in the circumstances." *Veltri v. Bldg. Serv. 32B–J Pension Fund*, 393 F.3d 318, 322 (2d Cir. 2004). The burden of proving that tolling is appropriate rests with the plaintiff. *Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 512 (2d Cir. 2002). The SAC alleges that Jordan learned about HAMP only recently, *see* FAC at 16, but it fails to allege any specific ways in which defendants prevented Jordan from asserting timely claims under the FHA or CCPA. Likewise, while the SAC notes that Jordan's health was unstable during this time, *see* Pl. Aff. 4–5, it does not detail any manner in which her medical conditions prevented her from filing claims in a timely manner. Accordingly, the Court finds that equitable tolling is not warranted here.

Jordan also argues that the Court should construe defendants' allegedly discriminatory actions as an ongoing or continuing violation, a unified course of conduct that began in 2006 and continued until 2013. *See id.* at 1, 35; Pl. Br. 32. "Where a continuing violation can be shown, the plaintiff is entitled to bring suit challenging all conduct that was a part of that violation, even conduct that occurred outside the limitations period." *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir. 1994). "[A] continuing violation may be found where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the [defendant] to continue unremedied for so long as to amount to a discriminatory policy or practice." *Id.*

In the employment context, courts have applied the continuing-violation theory to hostile work environment claims, which "are based on the cumulative effect of individual acts" and where "a single act of harassment may not be actionable on its own." *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 157 (2d Cir. 2012) (quoting *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 156 (2002)). By contrast, courts have declined to find continuing

violations where claims involve "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire" that "are easy to identify" and each "constitutes a separate actionable unlawful employment practice." *Id.* at 157 (quoting *Morgan*, 536 U.S. at 114). Similarly, in the housing context, courts have applied the continuing-violation theory "where the type of violation is one that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period," *Pantoja v. Scott*, No. 96 Civ. 8593 (AJP), 2001 WL 1313358, at *11 (S.D.N.Y. Oct. 26, 2001), for instance, where a housing complex had an ongoing policy of excluding and failing to accommodate disabled persons, *see E. Paralyzed Veterans Ass'n v. Lazarus-Burman Assocs.*, 133 F. Supp. 2d 203, 212–13 (E.D.N.Y. 2001). By contrast, courts have held that the continuing-violation theory does not apply to "separate" actions such as a denial of secondary financing and theft of mortgage proceeds. *Pantoja*, 2001 WL 1313358, at *10 (collecting cases). Such distinct actions, even if undertaken by the same entity for a common discriminatory purpose, do not comprise a continuing violation. *See id.* at *11.

As these examples make clear, the continuing-violation theory does not apply here. Jordan's allegations pertain to separate and discrete events, to wit, that defendants failed to grant promised refinancing terms, improperly foreclosed her home, dissolved her overdraft line of credit without notice, and wrongfully froze exempt funds during a garnishment action. *See, e.g.*, Pl. Br. 5 ("The Foreclosure is a solid stand alone Fair Housing Act claim."). These actions, if motivated by discriminatory animus, would constitute independently actionable conduct.

### 2.    Residential Real Estate–Related Transactions

As noted, § 3605 of the FHA prohibits discrimination against handicapped persons in the availability and terms and conditions of "residential real estate–related transactions." 42 U.S.C.

§ 3605(a). It defines such transactions as "(1) [t]he making or purchasing of loans or providing other financial assistance—(A) for purchasing, constructing, improving, or maintaining a dwelling; or (B) secured by residential real estate," as well as "(2) [t]he selling, brokering, or appraising of residential real property." *Id.* § 3605(b). Setting aside Chase's delayed reporting of Jordan's default on her mortgage, which is addressed below, Jordan's timely claims involve Chase's cancellation of her overdraft line of credit and its conduct during the garnishment proceedings. Those activities are not "residential real estate–related transactions." Rather, they relate to Jordan's retail banking relationship with Chase, and are independent of her mortgage or any other real estate transactions.

Jordan argues that the garnishment action was a "residential real estate–related transaction" because it was "linked back to a property fraud action," specifically, that the Florida court awarded legal fees in a suit in which "HUD violations and various property fraud claims were asserted." Pl. Br. 4. That argument is unavailing: The FHA applies only to "residential real estate–related transactions," not all activities related to residential real estate–related transactions. *Cf. Gorham-DiMaggio v. Countrywide Home Loans, Inc.*, 592 F. Supp. 2d 283, 290 (N.D.N.Y. 2008) (providing call centers and help lines to assist borrowers who have defaulted on their loans is not a residential real estate–related transaction), *aff'd*, 421 F. App'x 97 (2d Cir. 2011); *Pandozy v. Segan*, 518 F. Supp. 2d 550, 557 (S.D.N.Y. 2007) (plaintiff's dispute with his apartment cooperative's board of directors, which led him to attempt to cancel a contract with a buyer, was not a residential real estate–related transaction), *aff'd*, 340 F. App'x 723 (2d Cir. 2009). When Chase froze Jordan's account during the garnishment action, it was not making or purchasing a loan, providing other financial assistance, or selling, brokering, or appraising residential property. That conduct is, therefore, outside the scope of the FHA.

14

### 3.    Late Reporting to Credit Agencies

The SAC alleges that Chase delayed reporting Jordan's delinquent accounts to credit agencies, which, it claims, will extend her credit deficits for several years and will prevent her from recovering from the foreclosure and other financial hardships she has suffered.  Pl. Aff. 5, 19–20, 33.  To the extent this claim pertains to Chase's late reporting of Jordan's default on her mortgage, it conceivably involves a "residential real estate–related transaction" and therefore could fall under the purview of the FHA.  Nevertheless, the claim fails, for two reasons.

First, the SAC does not provide sufficient factual allegations linking this delay to Jordan's status as a disabled person.  To the contrary, the SAC contends that the delay was "related to the bundling of loans for the Federal programs" or "securitization issues."  *Id.* at 20; *see also id.* at 35 ("There is no question that JPMC put its own business interests ahead of Plaintiff Jordan's return to creditworthiness.").  The SAC notes the "possibility" that Jordan was treated differently than non-disabled customers, but offers no concrete factual allegations to support an inference that the delay was discriminatory in intent or effect.  *Id.* at 35.  As Jordan acknowledges, "the pled facts must 'rise above speculation.'"  Pl. Br. 30.  The Court cannot sustain a claim based on the mere "possibility" that Chase engaged in discriminatory conduct.  *See Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level.").

Second, Jordan's argument misunderstands the mechanics of credit reports.  The Equifax reports attached to Jordan's opposition to defendants' motion to dismiss, and incorporated by reference into the SAC, explain that: "Accounts not paid as agreed generally remain on your credit file for 7 years *from the date the account first became past due* leading to the current not paid status.  Late Payment History generally remains on your credit file for 7 years *from the date*

15

*of the late payment.*" Pl. Br. 11, 16 (emphasis added). Thus, the date that Chase reported the delinquency is irrelevant—the clock began running on "the date the account first became past due" or "the date the account first became past due." *Id.* Concretely, one Equifax report shows that Jordan opened her mortgage on September 8, 2006, and it became delinquent in June 2008. *Id.* at 10–11. Although Chase did not report the delinquency until January 31, 2014, the seven-year clock began running in June 2008. *See id.* A second report shows that Jordan opened an account on November 8, 2002, and the account became delinquent in May 2012, although Chase did not report that delinquency until November 10, 2014. *Id.* at 16–17. And a third shows that Jordan opened a line of credit on September 1, 2006 and became delinquent in April 2009, although Chase waited until April 1, 2011 to report that delinquency. *Id.* at 18. Jordan does not contend that these reported delinquency dates—June 2008, May 2012, and April 2009—are incorrect. As such, Chase's delay, whatever its motivation, was not an action that had adverse consequences for Jordan, and so cannot sustain her claims of discrimination.

## C.   CCPA § 1691 Claims

Section 1691 of the CCPA prohibits discrimination against any applicant with respect to any aspect of a credit transaction based on the fact that all or part of the applicant's income derives from a public assistance program, including Social Security disability benefits. *See* 15 U.S.C. § 1691. The July 31 Opinion dismissed some of Jordan's § 1691 claims as time-barred, and the remainder because the FAC did not adequately allege discrimination by defendants. Jordan now urges the Court to reconsider its decision that some of her claims are time-barred and provides new allegations regarding defendants' discriminatory animus. Accordingly, the Court revisits both issues.

### 1.   Statute of Limitations

Under § 1691, no action "shall be brought later than 5 years after the date of the occurrence of the violation." 15 U.S.C. § 1691e. Because Jordan commenced this action on December 19, 2013, Jordan's § 1691 claims are untimely insofar as they involve events that occurred before December 19, 2008, namely, the refinancing of her mortgage. For the reasons explained above, *see* pp. 11–13, the Court rejects Jordan's arguments regarding equitable tolling and continuing violations.

### 2.   Discriminatory Motive

To state a claim for discrimination under the CCPA (or the FHA), the SAC must make factual allegations that support a reasonable inference that defendants were motivated by discriminatory animus, in other words, that they took certain actions because of Jordan's status as a disabled person or her receipt of disability income. *See, e.g.*, *Burrell v. State Farm Fire & Cas. Co.*, No. 00 Civ. 5733 (JGK), 2001 WL 797461, at *10–11 (S.D.N.Y. July 12, 2001). As explained in the July 31, 2014 Opinion, the FAC's allegations of discrimination by defendants were utterly conclusory. Instead of pleading specific facts, the FAC baldly asserted that "[i]t would be almost impossible NOT to conclude that Chase Defendants operated with a bias against Plaintiff as a disabled person," FAC at 25, and that defendants' conduct "reveals a deep bias and more recently, retaliation in return for reporting that bias, that is most likely explained by her Disability status," *id.* at 26. The Court found that these "threadbare conclusions" did not state a claim for discrimination, while granting Jordan leave to amend to add more detailed factual allegations. *See* July 31 Opinion, at 18–20.

In its new allegations, the SAC identifies the following actions by defendants as "suspicious":

    a.  That Deutsche Bank rushed to book the DIL [deed in lieu] before we negotiated the actual rate.

    b.  That JPMC clearly colluded not only with Deutsche Bank, but with Lake Towers to "steer" this matter into a precipitous foreclosure.

    c.  That the term "HAMP" was never mentioned to me, nor were any Federal Government Programs discussed with me.

    d.  I was given no written documents to consider before having to execute the [deed in lieu] . . . .

    e.  The delay in reporting these loans to the Credit Bureaus . . . .

    f.  The subsequent closing of the Line of Credit . . . .

    g.  That the Foreclosure (DIL) was not reported to the Credit Bureaus at the time, but years later . . . .

Pl. Aff. 19–20; *see also id.* at 2, 5, 15, 18–19. The SAC alleges that these actions, considered in the aggregate, "form an irrefutable picture of a discriminatory animus based on stereotypes about the disabled." *Id.* at 4.

The SAC further alleges that these actions had a devastating effect on Jordan: She lost her Palm Beach home, which "offered [her] a respite from the harsh NYC winters and the stress of city life" and was therefore "essential to [her] survival." *Id.* at 14. "The foreclosure led to domestic displacement, damage to Plaintiff's credit report, and ultimately a period of housing instability (three evictions in four years) in NYC's volatile and expensive rental market." *Id.* at 4. Later on, "the seizure of Plaintiff's bank accounts and the filing of a $75,000 lien on her account" led to "a perilous downward spiral." *Id.* at 5. The SAC alleges that Jordan "was humiliated, anxious, and depressed," and that "[i]t is impossible to put into words the trauma that [she] had to endure." *Id.* at 31.

The Court appreciates the hardship that the foreclosure and garnishment proceedings imposed on Jordan. But the SAC's new allegations do not cure the FAC's deficiencies. These allegations make clear that the gravamen of Jordan's complaint is that defendants failed to waive their ordinary approach to foreclose and garnishment to accommodate her disability: The SAC complains that defendants foreclosed the Palm Beach property even though Jordan, "as a

disabled person," "required a Florida residence to navigate the extreme and volatile weather conditions in NYC." *Id.* at 4. Further, the SAC contends, defendants never raised the issue of her disability with her, encouraged her to remain in her home, or offered her an accommodation. *Id.* at 18, 34–35. The SAC asserts that Chase "should have kept the [overdraft line of credit] open, even if it were just to accommodate Plaintiff's disability," *id.* at 35, and that defendants' failure to do so reflects a corporate climate in which "ethical" concerns are "suspended in the interests of the Business," *id.* at 37.

Jordan, however, does not identify any law that required Chase to keep her line of credit open or to permit her to maintain a Florida residence. Under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq.*, Chase *was* required to make "reasonable modifications" when necessary to provide the same goods and services to individuals with disabilities as individuals without disabilities. *Id.* § 12182(b)(2)(A)(ii). And under federal laws such as the FHA and CCPA, defendants may not treat disabled persons *less* favorably than non-disabled persons. *See* 42 U.S.C. § 3605; 15 U.S.C. § 1691. But no provision of federal law requires financial institutions or other entities to treat disabled persons *more* favorably than non-disabled persons, so as, for example, to treat loan-repayment deadlines as non-binding when the borrower is disabled. Indeed, the approach Jordan appears to advocate, under which a financial institution could not enforce its policies with respect to recovering collateral from defaulting borrowers when the borrower is disabled, would potentially *violate* the ADA, which makes it "discriminatory to provide an individual . . . , on the basis of a disability . . . with a good, service, facility, *privilege, advantage, or accommodation* that is different or separate from that provided to other individuals, unless such action is necessary to provide the individual or class of individuals with a good, service, facility, privilege, advantage, or accommodation, or other

19

opportunity that is *as effective as* that provided to others." 42 U.S.C. § 12182(b)(1)(A)(iii)
(emphasis added). In all events, the law did not require defendants to postpone or forego the
foreclosure, or maintain Jordan's line of credit, simply because Jordan was disabled. The goal of
federal law is to place disabled persons on equal footing with similarly situated non-disabled
persons—no worse, and no better. *See, e.g., Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565,
573 (2d Cir. 2003) ("Both statutes," the ADA and the FHA, "require 'that covered entities make
reasonable accommodations in order to provide qualified individuals with an equal opportunity
to receive benefits from or to participate in programs run by such entities.'" (citation omitted)).

Furthermore, to the extent Jordan's SAC alleges cognizable adverse actions, it has not
adequately alleged that defendants' conduct was motivated by her status as a disabled person or
her receipt of disability benefits. The SAC contains only conclusory assertions that defendants'
conduct was motivated by discriminatory intent and that they treated non-disabled customers
more favorably. *See, e.g.*, Pl. Aff. 4, 35. And these conclusions are inconsistent with the SAC's
concrete factual allegations, which state, in effect, that defendants otherwise accommodated
Jordan's disability. The SAC states that Jordan had disclosed her disability and disability-related
income when she applied for a mortgage in 2006 and when she sought to refinance that mortgage
in 2008, *see id.* at 13, and that, between 2006 and 2012, Chase provided Jordan an overdraft line
of credit as a disability accommodation and "had always been accommodative of overdrafts due
to exceptional circumstances," *id.* at 32; *see also id.* at 5, 35. In short, Chase long
accommodated Jordan's disability before closing her line of credit and foreclosing on her home.
Thus, the SAC's allegations of discrimination do not "present a story that holds together."
*Swanson*, 614 F.3d at 404. There is no basis for inferring that defendants' actions were
motivated by a discriminatory intent against Jordan as a disabled person. To the contrary, on the

20

facts pled, the only reasonable inference is that defendants terminated Jordan's overdraft line of credit because her creditworthiness had declined and foreclosed on her home because she had fallen behind on payments.

In light of Jordan's default on her mortgage, this case is easily distinguished from those on which Jordan relies. *See* Pl. Br. 37. In *Boykin v. KeyCorp*, the plaintiff alleged that she was *qualified* for a loan—specifically, that "she satisfied all of KeyBank's credit requirements and KeyBank conditionally approved the loan that day"—but that the defendant denied the loan because of her race. 521 F.3d 202, 214 (2d Cir. 2008). Similarly, in *Hirschmann v. Hassapoyannes*, the court held that, to plead a violation of the FHA, a plaintiff must adequately allege "that he sought and was qualified to rent or purchase the housing." 811 N.Y.S. 2d 870, 875 (Sup. Ct. 2005). Here, by contrast, the SAC concedes that Jordan was in breach—she had missed mortgage payments. On the facts pled, defendants' decisions to foreclose her home and revoke her line of credit were legally justified. And while Jordan is surely correct that "JMPC put its own business agenda . . . ahead of [her] interests," Pl. Aff. 33, that is not the measure of compliance with the law. The SAC thus does not state a claim for discrimination in violation of either the FHA or CCPA.

### D.   Claims about Previous Litigation in Florida

Substantial portions of the SAC detail Jordan's prior litigation in Florida state court. *See* Pl. Aff. 2–14, 21–32. In brief, the SAC alleges that she contracted with James Pappas to purchase a condominium in Palm Beach. Pl. Aff. 5. Pappas repeatedly delayed the closing date and, when Jordan sought to cancel the sale, refused to refund her $90,000 deposit. *Id.* at 8–9. Jordan retained Florida law firm Boose Casey to pursue a claim against Pappas, who asserted a counterclaim for anticipatory breach. *Id.* at 6, 9. Boose Casey withdrew from the case four days

before the Palm Beach property finally closed. *Id.* at 6. Without the assistance of counsel, the SAC alleges, Jordan was "hosed" by Pappas and his attorney John Bannister, who "had a deal worked out in advance." *Id.*

Jordan then sued Boose Casey for breach of contract and fraud in Florida state court. *Id.* According to the SAC, the judges who handled the case—Judge Barkdull and Judge Rosenberg—were friends with Boose Casey attorneys. *Id.* at 7. As a personal favor to their friends, the SAC alleges, these judges "warehoused" the case for two years before secretly dismissing it. *Id.* at 6–7.

Jordan next sued Pappas, also in Florida state court. *Id.* at 6. By this time, the SAC alleges, Pappas had forced her home into foreclosure by demanding she pay for damage to the Palm Beach property that had resulted from concealed defects in the unit. *Id.* at 6–7. The SAC further alleges that Pappas's attorney in this Florida action, Ken Johnson, obstructed discovery, filed frivolous pleadings, and committed docket fraud throughout the litigation. *Id.* at 6, 9, 10. And the judges assigned to the case, Judge Marx and Judge Kelly, were friends with Johnson and engaged in "a scheme to dismiss the case as a favor." *Id.* at 6, 9. The SAC adds that the case was dismissed and mysteriously removed from the docket. *Id.* at 3–4.

After Jordan's case against Pappas was dismissed, the SAC alleges, Judge Marx and Judge Keyser granted Johnson and Bannister a substantial legal fee award. *Id.* at 11. This award led to the garnishment proceedings at issue in this litigation. Specifically, the SAC alleges, Judge Keyser intentionally failed to give her notice of the judgment and "schemed" with Johnson to seize Jordan's bank accounts. *Id.* at 23. Two other Florida state court judges, Judge Sasser and Judge Cohen, confirmed the judgment and transferred the case to New York through a secret *ex parte* process. *Id.* at 12. Judge Sasser also denied Jordan's request for a protective order, so

her confidential medical and financial records are vulnerable. *Id.* at 12–13, 27. To further humiliate Jordan, the SAC alleges, Judge Sasser ordered an audit of her safety deposit box, forcing her "to disclose the fact that there were diamond earrings that [she] had purchased with EXEMPT funds." *Id.* at 27. Meanwhile, the SAC alleges, Merrill Lynch was colluding with Johnson to release funds it held in a "Jordan Group" investment account to Bannister. *Id.* at 2–4, 30; *see also* Pl. Br. 8–9.

The SAC alleges that, throughout the Florida litigation, the courts were biased against Jordan, and acted to harm her, because she was disabled, female, and acting *pro se*. Pl. Aff. 8, 21–24. In sum, the SAC claims, the Florida court "has declared war on several constituencies":

> 1) Pro Se litigants: Here is a court where the majority of the judges have no idea what the legal standards are on their cases and where the Decision writing is sophomoric at best, but they are devising strategies to systematically dispose of Self-Represented litigations, where individual rights accrue; 2) Affluent or Wealthy Persons: This is rather shocking considering where this Court is located but these judges definitely target people whom they perceive as having money so that they can pay off their attorney and contractor friends; 3) Disabled Persons:  Not surprising that this amateur night court would find having to accommodate a Disabled person with a simple extension of time or a telephonic hearing, but that is PRECISELY what this Court objected to; 4) Women:  There is no question in my mind that Judge Marx is completely sexist and that he resents, as Judge Lippman resented, the advancement of women in the workplace. So I come along and I am a Disabled Woman acting Pro Se who lives in the Town of Palm Beach. These sexist judges were licking their chops. Vulnerable people are great targets for bullies because they are easily subdued.  They would never try this with a Corporation or White Male Authority Figure.

*Id.* at 12–13. The SAC contends that none of the Florida judges "even attempted to review the facts" or to inform Jordan of her rights under Florida antidiscrimination law. *Id.* at 9, 25.

These factual allegations do not give rise to a cognizable claim in this case.  In addition to being conclusory, they are directed at non-parties including Pappas, various Florida state court judges, and Merrill Lynch, and not at the defendants here, which are solely Chase, Deutsche Bank, and Shutts & Bowen. The SAC's allegations pertaining to the Florida litigation are thus

irrelevant to this case. The Court has no occasion to consider whether Jordan's allegations of corruption in the Florida courts or misfeasance by Merrill Lynch could be formulated to state a claim under federal or state law.

### E.      Leave to Amend

Federal Rule of Civil Procedure 15(a)(2) provides that leave to amend a complaint shall be "freely" given when "justice so requires," although "a district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party," *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). Granting leave to amend is "futile" if a revised claim still "could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002). If the problems with a claim are "substantive" rather than the result of an "inadequately or inartfully pleaded" complaint, an opportunity to replead would be "futile" and "should be denied." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

Because the Court dismissed Jordan's claims under § 407 of the SSA, the HAMP provisions in the EESA, and § 1673 of the CCPA for lack of a private right of action, "better pleading will not cure" the defect, and granting leave to amend would be futile. *Id.* The same is true of Jordan's FHA and CCPA § 1691 claims that are barred by the statute of limitations, and Jordan's FHA claims that do not involve residential real-estate transactions.

As to Jordan's remaining claims under the FHA and CCPA, the Court's judgment is that granting leave to amend would also be futile. Jordan has already had two opportunities to amend her complaint, *see* Dkt. 21, 67, and presented new factual allegations in her submission opposing the motion to dismiss, *see* Dkt. 79. The allegations and evidence presented in these documents, which total more than 700 pages, do not cure the substantive deficiencies in Jordan's initial

pleadings. And "[i]n the absence of any identification of how a further amendment would improve upon the Complaint, leave to amend must be denied as futile." *In re WorldCom, Inc. Sec. Litig*, 303 F. Supp. 2d 385, 391 (S.D.N.Y. 2004); *see also, e.g., Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 347 F. App'x 617, 622 (2d Cir. 2009) (summary order) ("Granting leave to amend is futile if it appears that plaintiff cannot address the deficiencies identified by the court and allege facts sufficient to support the claim."). The Court therefore dismisses Jordan's federal claims with prejudice.

## IV.   State Law Claims

Having dismissed Jordan's federal-law claims, the Court must determine whether it has a basis to exercise jurisdiction over her remaining claims against defendants, brought under New York and Florida statutes and common law. Jordan argues that the Court has diversity jurisdiction, which entitles her to a federal forum, or, in the alternative, that the Court should exercise supplemental jurisdiction, which is discretionary. The Court addresses each potential basis for continued federal jurisdiction in turn.

### A.   Diversity Jurisdiction

As the Court explained in its July 31 Opinion, "diversity jurisdiction exists over civil actions (1) between 'citizens of different States' and (2) between 'citizens of a State and citizens or subjects of a foreign state.'" *Herrick Co., Inc. v. SCS Commc'ns, Inc.*, 251 F.3d 315, 322 (2d Cir. 2001) (quoting 28 U.S.C. § 1332). Diversity jurisdiction "is available only when all adverse parties to a litigation are completely diverse in their citizenships." *Id.* "Therefore, in a case with multiple defendants, if a single defendant is from the same state as the plaintiff, the district court loses diversity jurisdiction over the entire action." *Phoenix Four, Inc. v. Strategic Res. Corp.*, 446 F. Supp. 2d 205, 212 (S.D.N.Y. 2006). In this case, diversity jurisdiction is clearly lacking

because both Chase and Jordan are citizens of New York.  *See* Dkt. 31, Ex. A (showing that Chase is headquartered in New York); FAC at 3 (stating that Jordan has resided in New York since 2009); *see also* Pl. Br. 33.

Contrary to Jordan's notion that complete diversity is required only in class-action cases, *see* Pl. Br. 25–26, courts have always required complete diversity in non-class (*i.e.* individual) suits.  *See, e.g., Strawbridge v. Curtiss*, 7 U.S. 267 (1806); *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 143 (2d Cir. 2014) ("Section 1332 requires complete diversity between opposing parties."); *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 302 (2d Cir. 2004) ("The citizenship requirement for diversity jurisdiction has been interpreted to mean complete diversity so that each plaintiff's citizenship must be different from the citizenship of each defendant.").  As the Supreme Court recently explained, "the purpose of the diversity requirement . . . is to provide a federal forum for important disputes where state courts might favor, or be perceived as favoring, home-state litigants." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 553–54 (2005).  Where, as here, both a plaintiff and a defendant are from the same state, there is no risk that the Court will favor one side due to home-state solidarity.

## B.    Supplemental Jurisdiction

Federal district courts have supplemental jurisdiction over state-law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). However, such jurisdiction is discretionary, *see City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997), and a district court "may decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction," 28 U.S.C. § 1367(c)(3).  In deciding whether to exercise its supplemental jurisdiction, a district court should balance the

traditional "values of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). Both the Second Circuit and the Supreme Court have held that, as a general rule, "when the federal claims are dismissed the 'state claims should be dismissed as well.'" *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)). Although the exercise of supplemental jurisdiction is discretionary, the ordinary case "will point toward declining jurisdiction over the remaining state-law claims." *In re Merrill Lynch*, 154 F.3d at 61 (citing *Cohill*, 484 U.S. at 350 n.7).

Here, no circumstances counsel in favor of the Court's exercising supplemental jurisdiction over Jordan's state-law claims for breach of contract, coercion, fraudulent and negligent misrepresentation, and fraudulent inducement. The Court has not invested the resources necessary to resolve these non-federal claims, which are wholly distinct from Jordan's federal claims, and factors of convenience, fairness, and comity do not require the Court to exercise supplemental jurisdiction. The Court accordingly declines to exercise supplemental jurisdiction over these claims. These claims are dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, the Second Amended Complaint is hereby dismissed. This dismissal is with prejudice as to Jordan's federal-law claims and without prejudice as to Jordan's state-law claims. The Clerk of Court is directed to terminate the motions pending at docket numbers 76 and 79, and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: March 6, 2015
       New York, New York